Filed 4/24/14  Vanderpol v. Starr CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| EUGENE VANDERPOL et al., | D062350 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2008-00054578-CU-PO-NC) |
| FRED STARR et al., | |
| Defendants and Respondents. | |


APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas, III, Judge.  Affirmed.


Manning & Kass, Ellrod, Ramirez, Trester, Darin L. Wessel and John D. Marino for Plaintiffs and Appellants.

Dicks & Workman, Joseph G. Dicks, Linda Workman; and Eric L. Hoffland for Defendants and Respondents.

This is the second appeal in this "spite fence" case brought under Civil Code section 841.4.[1]  Plaintiffs Eugene and Jenny Vanderpol allege their neighbors, defendants Fred and Indra Starr, maliciously erected or maintained a row of trees along their common property boundary for the dominant purpose of annoying the Vanderpols by blocking their ocean view.  In the first appeal, we concluded "a row of trees serving as a barrier between adjoining parcels of land can satisfy the statutory language of a 'structure in the nature of a fence' under [Civil Code] section 841.4."  (*Vanderpol v. Starr* (2011) 194 Cal.App.4th 385, 394 (*Vanderpol*).)  We reversed and remanded for a new trial.

In this appeal, the Vanderpols contend the trial court, following a new bench trial, erroneously applied the "dominant purpose" test to determine the requisite malice under Civil Code section 841.4 by focusing on the current condition of the Starrs' trees even though the Starrs planted trees they admitted were capable of eventually blocking the Vanderpols' view.  The Vanderpols also contend the court erred when it denied as untimely their request for a statement of decision under Code of Civil Procedure[2] section 632 based on the court's determination the trial lasted less than eight hours and the Vanderpols did not request a statement of decision prior to the matter being submitted.  Section 632 requires that a request for a statement of decision in a bench trial "be made

---

[1]     This statute declares a private nuisance is "[a]ny fence or other structure in the nature of a fence unnecessarily exceeding 10 feet in height maliciously erected or maintained for the purpose of annoying the owner or occupant of adjoining property . . . ."  (Civ. Code, § 841.4.)

[2]     All further statutory references are to the Code of Civil Procedure unless otherwise specified.

2

within 10 days after the court announces a tentative decision unless the trial is concluded within one calendar day or in less than eight hours over more than one day in which event the request must be made prior to the submission of the matter for decision." The Vanderpols contend the trial court erred by excluding from its calculation of trial length the time spent at a site visit and also by declining to consider the site visit as evidence adduced at trial.

We conclude the trial court applied the proper test for determining malice under Civil Code section 841.4, and its application of that test to the disputed facts is supported by substantial evidence. We also conclude the trial court did not err in its calculation of trial length or in its conclusion the Vanderpols' request for a statement of decision was untimely. Finally, we conclude the trial court did not err in its evaluation of the site visit. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

The Starrs purchased a residence in Carlsbad, California in 1998. The Vanderpols purchased a neighboring property in 2000. The rear of the Vanderpols' property adjoins the northern, rear border of the Starrs' property. The houses are situated on a hillside, with the Starrs' property located below the Vanderpols' property. The front of the Starrs' house and the rear of the Vanderpols' house have views of the Pacific Ocean.

---

[3]     We cite extensively to our opinion in *Vanderpol*, *supra*, 194 Cal.App.4th 385, but also include facts contained in the record before and after that appeal. We also occasionally use the parties' first names for the sake of convenience and intend no disrespect. (*Nairne v. Jessop-Humblet* (2002) 101 Cal.App.4th 1124, 1126, fn. 1.)

When the Starrs purchased their property, there were eucalyptus trees on it that were "very, very tall"--somewhere between 40 and 150 feet in height--"and full of foliage." About a year after they purchased the property, the Starrs did a "major clean up and [pruning] of all the [e]ucalyptus trees and the entire garden." They expected the eucalyptus trees would "come back more beautiful" and "bush out."

"When the Vanderpols purchased their home, they observed eucalyptus trees on the Starrs' property below. However, the trees then did not block their view . . . ." (*Vanderpol*, *supra*, 194 Cal.App.4th at p. 389.) "Eugene estimated the trees were then about nine to 12 feet tall and then observed the trees had recently been trimmed." (*Id*. at pp. 389-390.)

"In June 2001, Eugene approached the Starrs about trimming the trees." (*Vanderpol, supra,* 194 Cal.App.4th at p. 390.) "The Starrs agreed the trees could be trimmed at the Vanderpols' cost, but insisted the trimmer be bonded and licensed." (*Ibid*.) When the "trees were trimmed in July 2001[,] . . . . it was Indra who directed the trimmers regarding the trees to be trimmed and how much should be taken off the tops and sides of the trees." (*Ibid*.) "The trees were trimmed back to a uniform height of 14 feet." (*Ibid.*)

"About a year later, Eugene again contacted Indra about trimming the trees. Indra agreed to allow the trimming, but said she wanted it done when she was home by the same licensed and bonded trimmer who had trimmed the trees the year before." (*Vanderpol, supra,* 194 Cal.App.4th at p. 390.) Prior to this trimming, Eugene

4

approached Indra about installing a hedge in place of the eucalyptus trees, but Indra rejected the idea, explaining to Eugene that she liked the smell of the trees. (*Id*. at p. 390, fn. 5.)

The parties disagree about several aspects of the 2002 tree trimming. "According to Eugene, Indra was present when the trimmers arrived, and she instructed the trimmers to cut the trees in the same manner and to the same height as before. At the conclusion of the trimming, Eugene and Indra thanked each other and gave each other a 'thumbs up' as they walked back to their respective properties." (*Vanderpol, supra,* 194 Cal.App.4th at p. 390, fn. omitted.) Indra, however, asserts "she was *not* home when the trees were trimmed in 2002, that when she and Fred arrived home that day they 'were very perplexed the trees were cut really short,' and that as much as 20 feet had been taken off the tops of some of the trees." (*Id*. at p. 390, fn. 4.)

"In mid-July 2004, Eugene again contacted Indra regarding trimming the trees. They agreed the trimming would take place on a Saturday in late July . . . ." (*Vanderpol, supra,* 194 Cal.App.4th at p. 390, fn. omitted.) "When the trimmers arrived, Eugene telephoned the Starrs and spoke to their daughter who said, 'Come down. Can we speak about the trees that need to be trimmed?' As he had done in the past, Eugene went to the far corner of the lot and jumped the chain-link fence where there was a pathway to the Starrs' house." (*Id*. at pp. 390-391.)

"When Indra and Eugene met on the Starrs' property, Indra told Eugene she would only allow a few trees in the corner of her lot to be trimmed two or three feet off the top."

5

(*Vanderpol, supra,* 194 Cal.App.4th at p. 391.) Once again, the parties disagree about what happened next. According to Eugene, when he accused Indra of going back on her word, she responded, "Oh, you're a bully. I know how to deal with you." When Eugene began to leave the Starrs' property, Indra offered to allow a little more trimming than she had initially offered--a few feet off the top of four or five trees--but Eugene concluded that was "not going to do anything" and declined. Indra then started screaming "[g]et off my property. I'm calling the police," and had to be physically restrained by her daughter. As Eugene began returning home, he and Indra continued exchanging remarks. Eugene claimed he never raised his voice, but acknowledged becoming curt. As Eugene walked off, Indra screamed "I don't want to hate you. I hate your house, and [your] stupid noisy pets," also referring to them as his "[s]tupid f-ing dogs." Eugene interpreted this as a death threat against his dogs and reported it to the police. Eugene explained that Fred Starr was friendly to the Vanderpols' dogs and would occasionally feed them milk bones through the fence, suggesting Eugene was concerned Indra would take advantage of that and poison the dogs.

Jenny Vanderpol corroborated Eugene's testimony, explaining that she "was upstairs in the house with the couple's baby when she heard shouting, looked outside and saw Indra screaming at her husband Eugene in the Starrs' backyard." (*Vanderpol, supra,* 194 Cal.App.4th at p. 391.)

"Not surprisingly, Indra's testimony regarding this event varied substantially from Eugene's testimony." (*Vanderpol, supra,* 194 Cal.App.4th at p. 391, fn. 6.) She denied

6

shouting at Eugene, denied saying she hated his dogs and his house, and denied her daughter had to restrain her. On the contrary, she asserted Eugene "went ballistic" when she explained to him that, because the trees had been "butchered" during the 2002 trimming (with four or five dying), she was only willing to allow a few trees to be trimmed. Eugene began "hollering and screaming" that Indra was reneging on her word and pointed his finger in her face. Indra testified that her daughter saw what was happening, grabbed Indra to pull her safely away from Eugene, and screamed for Indra's son, who lived in the Starrs' guesthouse. As Indra's son approached, Eugene fled through the Starrs' backyard. The Starrs' son and daughter corroborated that "Eugene, and not their mother, was the aggressor in the dispute." (*Id*. at p. 391, fn. 6.)

The Starrs declined subsequent requests from the Vanderpols to trim the eucalyptus trees, but have trimmed them twice of their own volition since the 2004 incident. The Vanderpols contend each occasion was timed to coincide with each of the two trials in this case.

Sometime after the 2004 incident, the Starrs planted numerous additional trees in their backyard. The trees included 15 to 20 conifer pine trees and approximately 65 Italian Cypress trees, which Indra acknowledged "can grow extremely tall." The Vanderpols contend the Starrs began planting the trees about a month after--and because of--the 2004 incident. The Starrs, however, assert that some of the cypress along the property line already existed when they bought the property and that they did not plant the additional trees until years later to restore their privacy after the Vanderpols removed

7

several pepper trees from their own property when they graded their backyard to install a pool.

"In 2007, the Vanderpols' legal counsel notified the Starrs that their trees were obstructing the Vanderpols' view and annoying the Vanderpols, and advised the Starrs to trim their trees. Eugene estimated the trees were then four to five times taller than when he and his wife first saw the property in 2000. The Starrs, however, did not trim their trees. Indra estimated that in early 2009 the trees were about the same height as when they first moved into their house, roughly 40 to 50 feet high, with the taller trees located at the corner of the parties' property line." (*Vanderpol, supra,* 194 Cal.App.4th at p. 391.)

"The Vanderpols sued the Starrs in 2009, alleging the Starrs 'wrongfully maintained, planted and/or installed numerous trees, shrubs and/or similar plants . . . near the common property line [of the parties] at such a height and density so as to be annoying and damaging to [the Vanderpols].' The Vanderpols alleged a cause of action for private nuisance based on California's 'spite fence' statute, Civil Code section 841.4, and based on ordinary nuisance principles, [Civil Code] sections 3479 and 3481, and sought injunctive and declaratory relief . . . ." (*Vanderpol*, *supra*, 194 Cal.App.4th at p. 388, fn. omitted.) The jury returned a special verdict in favor of the Vanderpols, and the court enjoined the Starrs from maintaining any of their trees along the parties' property line at a height in excess of 15 feet, nine inches. (*Ibid*.)

The Starrs appealed. We agreed that the special verdict form did not enable the Vanderpols to make the necessary showing of injury under Civil Code section 841.4 and,

8

consequently, reversed the judgment and remanded for a new trial. (*Vanderpol, supra,* 194 Cal.App.4th at pp. 389, 397-398.) Because of this disposition, we concluded it was also necessary to address the Starrs' question of whether trees could constitute a spite fence under Civil Code section 841.4, even though the Starrs "waited until their reply brief to raise this issue on appeal and provided no explanation for not addressing it in their opening brief . . . ." (*Id*. at p. 389, fn. 2.) We agreed with the well-reasoned decision in *Wilson v. Handley* (2002) 97 Cal.App.4th 1301 (*Wilson*) and concluded "that a row of trees serving as a barrier between adjoining parcels of land can satisfy the statutory language of a 'structure in the nature of a fence' under [Civil Code] section 841.4." (*Vanderpol*, *supra*, 194 Cal.App.4th at p. 394.)

Upon remand, the court held a status conference regarding further proceedings. Without yet deciding on the manner of the new trial, the court concluded "limited discovery should be allowed on the current state of the growth . . . ." The court also stated it was "not inclined to take a jury out to a site inspection if [the court] were to impanel a jury," but the court was willing to visit the site if the parties would stipulate to excuse the court reporter from attending. The parties agreed and a site visit occurred on November 9, 2011. Two days later, the Vanderpols waived jury.

A bench trial began on Monday, November 14, 2011. The court and parties agreed to proceed by admitting the previous trial exhibits and transcripts of the parties' prior trial testimony, which they would supplement with live testimony from all but

9

Jenny Vanderpol.[4]  Based on this streamlined approach, counsel expected to conclude trial by the following day.  The court heard live testimony from Eugene Vanderpol and the Starrs on November 14, and again from Eugene Vanderpol on November 15.  Counsel then gave closing arguments and the court took the matter under submission.

On November 21, 2011, the court ruled in favor of the Starrs.  The court explained its ruling in a three-page minute order dated November 21 and a substantively identical four-page "Verdict Following Court Trial" (Verdict) dated November 22.  The court found "both sides of this dispute evidenced a lack of candor to the Court which cause[d] the Court to question their credibility."[5]  Consequently, "the Court relie[d] heavily on the photographs provided."  Based on that evidence, the court found as follows:

> "The Court is persuaded that the reduction in view causes annoyance to the [Plaintiffs], and that it substantially interferes with [Plaintiffs'] enjoyment of the property.  However, the Court is not persuaded that maintenance of the trees, *as currently and historically evidenced* by photographs, is done for the dominant purpose of annoying or vexing Plaintiffs.  Instead, the photographs introduced into evidence establish that the trimming performed in 2002 was so substantial and invasive that it is not unreasonable for a property owner to withdraw consent to further trimming by the upslope neighbor.  Defendants are cautioned, however, that allowing the subsequently planted trees to grow in the future to a height in excess of the previously existing pepper trees would likely change the Court's analysis."

---

4      The Vanderpols divorced after the case was filed and Jenny Vanderpol moved from the property in June 2010.  She did not attend or testify at the new trial.

5      The court cited as examples that the Starrs "appeared incapable of acknowledging that the height of the trees interfered with" the Vanderpols' view, and that the Vanderpols "could not acknowledge that the trees, when trimmed as far back as shown by pictures in 2002, might lose their perceived beauty and shade."

10

Ten days later, the Vanderpols requested a statement of decision under section 632. At a subsequent ex parte hearing, the court stated its tentative position was that the Vanderpols' request was untimely because trial did not exceed eight hours. After formal briefing and oral argument, the court denied the Vanderpols' request.

On July 13, 2012, the Vanderpols concurrently filed their Notice of Appeal and Notice of Intent to Move for New Trial. In their memorandum in support of a new trial, the Vanderpols argued the trial court improperly applied the dominant purpose test and left core matters undecided, and asserted there were irregularities in the proceedings because the court did not consider the site visit or its length to be part of the trial or evidence.

The court denied the motion for new trial, explaining the court "believe[d] that the dominant purpose analysis performed by the Court is the accurate one," and emphasized, "[j]ust to be clear, not only was it not a dominant purpose, I don't even think it was a significant purpose of the trees being allowed to regrow."[6]

DISCUSSION

The Vanderpols contend the trial court erred: (1) in its determination of malice under Civil Code section 841.4, (2) by denying as untimely their request for a statement of decision, and (3) in not considering the site visit in the calculation of trial length or as evidence adduced at trial. We first consider the denial of the request for a statement of

_____

[6]    We grant the Vanderpols' motion to augment reporter's transcript on appeal to include proceedings on the new trial motion.

11

decision because it is a threshold issue—if the court erred in denying the request, we would remand with direction to prepare a statement of decision;[7] if the court did not err, then the doctrine of implied findings applies to support the trial court's rulings.[8] Because, as we explain below, the trial court did not err in its denial of the Vanderpols' request for a statement of decision, we address the Vanderpols' other contentions and affirm.

I

The Vanderpols contend the trial court erroneously concluded their request for a statement of decision under section 632 was untimely because the court incorrectly found the trial lasted less than eight hours. They argue the court should have included in its calculation the time the court spent reading transcripts from the first trial and time spent at the November 9, 2011, site visit, and should have commenced when the parties were ordered present for trial rather than when proceedings actually began each day. With those items included, the Vanderpols maintain trial exceeded eight hours and their request for a statement of decision was timely.

---

[7] "If a statement of decision is timely requested and not waived, the trial court must render a statement of decision and it is reversible error if it does not do so. [Citation.] Under those circumstances, the matter is remanded to the trial judge who originally presided over the trial to complete the process." (*Karlsen v. Superior Court* (2006) 139 Cal.App.4th 1526, 1530-1531.)

[8] (*C9 Ventures v. SVC-West, L.P.* (2012) 202 Cal.App.4th 1483, 1499 ["absent a statement of decision, '[t]he doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment' "], quoting *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.)

We conclude the trial court properly excluded the time spent off the bench reading trial transcripts and correctly commenced its timekeeping when proceedings in court actually began. Because of these conclusions, adding the time spent at the site visit would not cause the trial to exceed eight hours, and we do not reach the merits of that issue.

A. *Summary of Applicable Legal Principles*

Under section 632, a "court trying a question of fact must issue a statement of decision explaining the factual and legal bases for its decision on the principal controverted issues at trial, upon a timely request by any party appearing at trial." (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 293.) Among other things, "[a] statement of decision facilitates appellate review by revealing the bases for the trial court's decision." (*Ibid.*, fn. omitted.) "If a statement of decision is timely requested and not waived, the trial court must render a statement of decision and it is reversible error if it does not do so." (*Karlsen v. Superior Court, supra*, 139 Cal.App.4th at pp. 1530-1531.)

But "[a] party's entitlement to a statement of decision depends on the party making a timely request." (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 61 (*Gorman*).) The timeliness of the request depends on the length of the trial: "The request must be made within 10 days after the court announces a tentative decision unless the trial is concluded within one calendar day or in less than eight hours over more than one day in which event the request must be made prior to the submission of the matter for decision." (§ 632, italics added.)

13

"[F]or purposes of keeping time of trial under section 632 in civil proceedings . . . , the time of trial means the time that the court is in session, in open court, and also includes ordinary morning and afternoon recesses when the parties remain at the courthouse."  (*In re Marriage of Gray* (2002) 103 Cal.App.4th 974, 980 (*Gray*).)  "It does not include time spent by the judge off the bench without the parties present--lunch, for example--except for such routine recesses as occur during the day."  (*Ibid.*)

B.  *Analysis*

The Vanderpols did not request a statement of decision "prior to the submission of the matter for decision."  (§ 632.) Therefore, if the trial--conducted "over more than one day"--lasted less than eight hours, their request was untimely.  (*Ibid*.)

The court found trial lasted seven hours 25 minutes--35 minutes less than the eight-hour threshold.  This included time actually spent on the record in open court, but excluded time the court spent reviewing prior trial testimony and at the site visit.  The court's methodology comports with the rule announced in *Gray* that trial time includes only "the time that the court is in session, in open court" and "does not include time spent by the judge off the bench."  (*Gray*, *supra*, 103 Cal.App.4th at p. 980.)

In *Gray*, the trial court "expressly found that [it conducted] a court trial that concluded in less than eight hours over more than one day" (*Gray, supra,* 103 Cal.App.4th at p. 975), and consequently "concluded that appellant's request for a statement of decision, . . . filed only after the trial court's tentative decision was filed, was untimely."  (*Id.* at pp. 975-976.)  The appellant argued her request was nonetheless timely

14

because, based on the size of the record and complexity of the issues, "it [was] inconceivable that trial lasted less than one day irrespective of the actual number of hours spent arguing the case." (*Id*. at p. 978.) The court rejected that argument in favor of an objective timekeeping rule:

> "We cannot realistically expect trial judges to keep stopwatches to record time spent off the bench in chambers, a home office, or at the kitchen table studying the law and evidence. Rather, the eight-hour rule in section 632 requires a simple and obvious mode of timekeeping that everyone, including attorneys, can keep track of. This means that, for purposes of keeping time of trial under section 632 in civil proceedings other than administrative mandamus (an issue not before us), the time of trial means the time that the court is in session, in open court, and also includes ordinary morning and afternoon recesses when the parties remain at the courthouse. It does not include time spent by the judge off the bench without the parties present--lunch, for example--except for such routine recesses as occur during the day." (*Gray*, *supra*, 103 Cal.App.4th at pp. 979-980.)

Similarly, the appellant in *Gorman, supra,* 178 Cal.App.4th 44 argued that the hearing on its motion for attorney fees[9] lasted longer than "eight hours over more than one day" because "the trial included all judicial consideration of their motion, which involved 520 pages of briefing and evidence . . . , whether that consideration took place on or off the bench, and apparently during or after regular working hours." (*Gorman, supra,* 178 Cal.App.4th at p. 61.) As in *Gray*, the *Gorman* court rejected that argument and instead adopted an objective timekeeping method:

---

9     The court "assume[d] for the sake of discussion that [such a] hearing . . . amounted to a trial within the meaning of section 632 . . . ." (*Gorman, supra,* 178 Cal.App.4th at p. 61.)

"The reality is that trial judges spend additional time off the bench preparing for hearings, researching the law, and reading motions and briefs, but the statute indicates an intent not to count that time as trial time. Otherwise the trial judge would have to submit timesheets to the parties in a case so they would know when to request a statement of decision. The parties may be expected to know and add up the time they have spent in court hearings on a case, but not how long the judge has considered the case outside of the courtroom. We reject plaintiffs' argument that judicial time off the bench should count in determining when to request a statement of decision." (*Gorman, supra,* 178 Cal.App.4th at p. 63.)

The Vanderpols acknowledge the holdings in *Gray* and *Gorman*, but urge us to disregard them in favor of *Bevli v. Brisco* (1985) 165 Cal.App.3d 812 (*Bevli*) and *Gordon v. Wolfe* (1986) 179 Cal.App.3d 162 (*Gordon*) because the parties here "agreed the court could consider the prior trial testimony . . . in lieu of presenting the same live testimony again."

Preliminarily, we observe that both *Bevli* and *Gordon* were decided when section 632 did not include an eight-hour threshold for trials held over more than one day, but instead referred only to "a trial lasting less than one day." (*Gray*, *supra*, 103 Cal.App.4th at p. 978.)[10] The *Gordon* court's timekeeping analysis consisted primarily of a mechanical determination that the trial lasted longer than one day because, "[r]egardless of the number of hours counsel actually spent before the court, th[e] trial was conducted over more than one court calendar day." (*Gordon*, *supra*, 179 Cal.App.3d at p. 166

[10] At the time, section 632 provided: "Upon the request of any party appearing at the trial, made within 10 days after the court announces a tentative decision, or if the trial has lasted less than one day, made prior to submission of the matter for decision, the court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial. . . ." (*Gordon*, *supra*, 179 Cal.App.3d at p. 165.)

16

["[c]ourts may have to count days, but they are not required to count hours and minutes"].)  "In light of the 1987 amendment to section 632 [imposing an eight-hour threshold for trials held over more than one day], *Gordon*'s remark no longer states good law on this point."  (*Gray*, *supra*, 103 Cal.App.4th at p. 979.)  Although the trial court in *Gordon* "announced it would have to 'take a day . . . and devote it to [the] case' . . . to read the deposition of plaintiff's economist which was submitted in lieu of live testimony," it is unclear how much time the trial court actually spent reading that transcript or whether that fact, standing alone, would have been sufficient absent the court's mechanical application of the one-day analysis under then-existing section 632. We find *Gordon* unpersuasive.

The Vanderpols' reliance on *Bevli* is also unpersuasive.  In addition to being decided under the former version of section 632, that case arose in the "unique" context of a proceeding on a petition for writ of administrative mandamus where the proceedings on the record consumed only 39 pages of a reporter's transcript but the court admitted into evidence a nine-volume administrative transcript.  (*Bevli*, *supra*, 165 Cal.App.3d at pp. 820-821.)  Due to the distinctly different procedural nature of a proceeding in administrative mandamus, we decline to apply *Bevli* in the instant case.  (See *Gray*, *supra*, 103 Cal.App.4th at p. 979 ["*Bevli* is distinguishable because it involves an administrative mandamus proceeding, which ordinarily involves the reading of a substantial administrative record"].)

Even if *Bevli* weren't distinguishable on purely procedural grounds, we would nonetheless find it factually distinguishable. The trial court there stated on the record the precise amount of time it spent off the record reading the administrative transcript. (*Bevli*, *supra*, 165 Cal.App.3d at p. 821 [" 'It took from 10:00 o'clock yesterday morning until 11:00 o'clock last night and from 6:00 o'clock to 8:00 o'clock this morning to do so, but it has been done.' "].) By contrast, the record here contains references by the court regarding when it *intended to* review the transcripts, but there is no precise, after-the-fact accounting of the time the court actually spent. This distinction is dispositive. (See, e.g., *Kearl v. Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1051 ["unlike the situation in *Bevli,* the record does not reflect the amount of time expended by the trial court in this regard"]; *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 238 ["In *Bevli,* however, the court stated on the record the exact number of hours spent reading the record prior to the opening of courtroom proceedings. In our case, although the judge indicated that he had spent some time reading the record, he did not specify how long, nor can we infer any particular amount of time from his comments."].)

Because we find *Gray* and *Gorman* persuasive and *Gordon* and *Bevli* distinguishable, we conclude "the time of trial means the time that the court is in session, in open court," including regular morning and afternoon breaks, but excluding lunch. (*Gray*, *supra*, 103 Cal.App.4th at p. 979-980.) In reaching this conclusion, we necessarily reject the Vanderpols' contention that trial time commences at "the time that

18

the parties were ordered to be present for trial" rather than the time they actually spent in session, in open court.[11]

Finally, the Vanderpols contend the trial court erred by excluding from its calculation of trial time the time it spent at the site visit. Substantial evidence shows that even if the court had included the site visit in its calculation, the trial still would not have exceeded eight hours.[12] Because inclusion of the site visit would not have affected the outcome, we decline to reach the merits of the issue. (*Swanson v. State Farm General Ins. Co.* (2013) 219 Cal.App.4th 1153, 1165, fn. 11.)

We also reject the Vanderpols' separate contention that the trial court abused its discretion in not considering the site visit as an evidentiary part of the trial. Additional considerations support this conclusion. The record does not persuade us that the court intended its site visit to constitute a formal visit under section 651--it occurred at a time when the parties were still anticipating a jury trial; the court and parties referred to it as "an informal walk through," and "just a walkthrough"; and the court reporter and jury were not present, as required by section 651, subdivision (b). It also appears that although the court stated it did not consider the site visit part of the trial, the court

[11]    This is especially so where, as here, the trial court found the parties routinely were unprepared to begin on time:  "[the court] was ready to go at 9:00; the parties weren't. And they were still exchanging exhibits and talking amongst themselves. [¶] . . . And every day lawyers were walking in at two minutes to 9:00 and then needing time to set up their exhibits and everything else."

[12]    The court estimated the site inspection lasted 20 minutes; the Starrs' counsel stated in a declaration that it lasted no longer than 30 minutes. In either event, trial still would have lasted less than eight hours (seven hours 45 minutes and seven hours 55 minutes, respectively).

19

nonetheless considered it in some capacity in providing context to the 60-plus photographic trial exhibits the court reviewed. We are also unpersuaded by the Vanderpols' argument that additional evidence of the current condition of the trees would have altered the outcome; the court considered--and was unmoved by--that evidence in connection with the Vanderpols' new trial motion. Finally, any error in not considering the site visit would not have been prejudicial because the trial court indicated that considering the site visit would not have affected the court's findings. (See, e.g., *Wood v Jamison* (2008) 167 Cal.App.4th 156, 161 ["There is always some conjecture in determining whether newly discovered evidence was likely to produce a different result where the case was tried to a jury. . . . But where, as here, the same trial court to which the case was tried determines the new evidence was unlikely to have made a difference, there is no conjecture. We simply have no basis for contradicting the trial court."].)

Although the Vanderpols' untimely request forfeited their entitlement to receive a statement of decision, we note the Vanderpols were not left without an explanation of the court's decision. The trial court provided the nearly four-page Verdict that included "factual findings" and a discussion of "legal elements." We have not examined the Verdict to determine whether it would constitute a sufficient statement of decision under section 632, but it at least superficially achieves the statute's objective of " ' "fairly disclos[ing] the court's determination as to the ultimate facts and material issues in the case." ' " (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 500.) The court

20

informed the Vanderpols that a formal statement of decision would not have differed materially from the Verdict.

Finally, we observe that because the parties "expected the matter to be completed quickly [(they expected to conclude by the following morning), they] . . . had fair warning to request the statement, if desired, before the case was submitted for decision." (*Gordon, supra,* 179 Cal.App.3d at p. 166, citing *Mitchell v. County of Orange* (1985) 165 Cal.App.3d 1185.) Accordingly, "the risk of forfeiting the statement of decision should rest with losing counsel who could have avoided the problem by expending only a minimal amount of effort. To conclude otherwise improperly transfers the burden to the justice system contrary to section 632's legislative purpose of saving judicial time for more important, i.e., longer cases." (*R.E. Folcka Construction, Inc. v. Medallion Home Loan Co.* (1987) 191 Cal.App.3d 50, 56; *Mitchell*, at p. 1190, fn. 5 ["Quibbling over the number of hours expended is unnecessary because the process is so simple--a mere oral request 'made prior to submission of the matter.' "].)

II

The Vanderpols also contend the trial court misapplied the test for determining malice under Civil Code section 841.4--the dominant purpose test--by focusing on "whether the additional planted trees *currently* blocked the [Vanderpols'] views" even though the Starrs admitted the trees were capable of *eventually* blocking them. (Italics added.) They claim the trees' potential height, coupled with the Vanderpols' version of

21

the 2004 incident and timing of the Starrs' subsequent tree-planting, should have led the court to conclude the Starrs' dominant purpose was to annoy the Vanderpols.

A. *Standard of Review*

The Vanderpols urge us to review de novo the court's dominant purpose finding. They claim their challenge relates to questions of statutory interpretation and whether the court applied the proper legal standard; they insist they are not making a substantial evidence challenge. The Vanderpols' extensive rearguing of conflicting evidence undermines their claim.

We view the Vanderpols' challenge as presenting a mixed question of law and fact, which we review according to the following principles:

> "Questions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial-evidence test. Questions of law relate to the selection of a rule; their resolution is reviewed independently. Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied. If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 (*Crocker*).)

We review de novo the trial court's selection of the dominant purpose test as the rule for determining malice under Civil Code section 841.4, and review for substantial evidence the court's application of that test in determining the Starrs' intent--an inquiry

22

that "requires application of experience with human affairs." (E.g., *Crocker*, *supra*, 49 Cal.3d at p. 888.)

   B.   *The Trial Court Properly Selected the Dominant Purpose Test as the Rule for Determining Malice Under Civil Code Section 841.4*

Civil Code section 841.4 declares a private nuisance as "[a]ny fence or other structure in the nature of a fence unnecessarily exceeding 10 feet in height maliciously erected or maintained for the purpose of annoying the owner or occupant of adjoining property . . . ." In *Vanderpol*, *supra*, 194 Cal.App.4th at p. 394, we found persuasive the reasoning of *Wilson*, *supra*, 97 Cal.App.4th 1301, and "conclude[d] that a row of trees serving as a barrier between adjoining parcels of land can satisfy the statutory language of a 'structure in the nature of a fence' under [Civil Code] section 841.4." The Vanderpols now appeal the trial court's application of the dominant purpose test for determining malice under Civil Code section 841.4.

We again look to *Wilson*, which adopted the " 'dominant purpose' test for determining whether the 'malice' element of [Civil Code] section 841.4 has been satisfied." (*Wilson*, *supra*, 97 Cal.App.4th at p. 1313.) In doing so, the court relied primarily on *Rideout v. Knox* (1889) 148 Mass. 368, 370, 19 N.E. 390, 391 (*Rideout*), in which the Supreme Judicial Court of Massachusetts upheld the constitutionality of Massachusetts's spite-fence statute, which is substantially similar to Civil Code section

23

841.4.[13] (*Wilson*, *supra*, 97 Cal.App.4th at p. 1312.)  The *Rideout* court explained the

"malice" element of that statute as follows:

> "[W]e are of opinion that it is not enough to satisfy the words of the
> act that malevolence was one of the motives, but that malevolence
> must be the dominant motive,-a motive without which the fence
> would not have been built or maintained.  A man cannot be punished
> for malevolently maintaining a fence for the purpose of annoying his
> neighbor merely because he feels pleasure at the thought he is giving
> annoyance, if that pleasure alone would not induce him to maintain
> it, or if he would maintain it for other reasons, even if that pleasure
> should be denied him.  If the height above six feet is really necessary
> for any reason, there is no liability, whatever the motives of the
> owner in erecting it.  If he thinks it necessary, and acts on his
> opinion, he is not liable because he also acts malevolently."
> (*Rideout*, *supra*, 148 Mass. at p. 373, 19 N.E. at p. 392.)

Under the dominant purpose test as adopted by *Wilson*, "the pertinent question is

whether the [defendants'] dominant purpose in planting the . . . trees along their property

line with plaintiffs was to annoy plaintiffs."  (*Wilson*, *supra*, 97 Cal.App.4th at p. 1313.)

"[T]he intent to annoy the neighbor need not be the *sole* purpose for building or

maintaining the fence. . . , but it must at least be the 'dominant' purpose."  (*Id*. at p. 1312-

1313.)  "This is a factual determination to be made by the trial court in the first instance

based on the evidence received at trial."  (*Id.* at p. 1313.)

We find *Wilson* persuasive and conclude that the dominant purpose test is the

proper standard for determining malice under Civil Code section 841.4.  The trial court's

Verdict expressly references the Starrs' "dominant purpose" and reflects an analysis to

---

13    That statute read in pertinent part as follows:  "Any fence, or other structure in the
nature of a fence, unnecessarily exceeding six feet in height, maliciously erected or
maintained for the purpose of annoying the owners or occupants of adjoining property,
shall be deemed a private nuisance."  (*Rideout, supra,* 148 Mass. at p. 370.)

ascertain their intent under that standard. We conclude the trial court did not err in its "selection of a rule." (*Crocker*, *supra*, 49 Cal.3d at p. 888.)

The Vanderpols argue for the first time in their reply brief that we should "hold that the dominant purpose test requires consideration of objective motivating factors rather than the proffered subjective state of mind of the person erecting and/or maintaining the fence at issue," and that the "case should be reversed and remanded for a new trial with clarification that an objective standard of malice be employed . . . ." Because the Vanderpols "waited until their reply brief to raise this issue on appeal and provided no explanation for not addressing it in their opening brief, we typically would decline to consider it because they deprived the [Starrs] of the opportunity to respond." (*Vanderpol*, *supra*, 194 Cal.App.4th at p. 389, fn. 2.) However, we choose to consider it and explain why it has no merit. (See, e.g., *Greenlining Institute v. Public Utilities Com.* (2002) 103 Cal.App.4th 1324, 1329, fn. 5.)

First, *Wilson*, *supra*, 97 Cal.App.4th at page 1309 suggests the dominant purpose test relates to subjective intent. In addressing "whether a particular fence or fence-like structure '*unnecessarily*' exceeds 10 feet in height[,] [the court concluded that question] cannot be answered *without reference to the ostensible purpose or purposes the defendant claims for the structure*." (*Ibid*., italics added.) Similarly, the *Wilson* court stated the dominant purpose test "is a factual determination to be made by the trial court in the first instance based on the evidence received at trial" (*id.* at p. 1313), which can include the defendant's proffered purpose:

25

"If the trial court finds the Handleys planted the trees primarily for reasons other than to annoy plaintiffs--for example, to 'beautify' their property or to protect their privacy from the two-story log house looming next door, *as the Handleys claimed*, then annoyance was not the dominant purpose of the row of trees and the 'malice' element of [Civil Code] section 841.4 is not satisfied. On the other hand, if the court finds the Handleys planted the trees primarily to annoy plaintiffs, and other purposes such as aesthetics and privacy, if any, were only subordinate to the dominant purpose of annoyance, then the 'malice' element has been satisfied." (*Wilson*, *supra*, 97 Cal.App.4th at p. 1313, italics added; see also *Rideout*, *supra*, 148 Mass. at p. 373, 19 N.E. at p. 392 [construing the language " 'maliciously erected, or maintained for the purpose of annoying' adjoining owners or occupiers" as "clearly express[ing] that there must be an *actual* malevolent motive, as distinguished from merely technical malice"], italics added.)

Second, the Vanderpols' extensive reliance on the Washington Supreme Court's decision in *Karasek v. Peier* (1900) 22 Wash. 419 [61 P.33] is misplaced. Although that court *considered* adopting an objective test under which "the question whether the structure was maliciously erected is to be determined by its character, location, and use, rather than by an inquiry into the actual state of mind of the person erecting it" (*id.* at p. 631), the court ultimately *rejected* such a rule because "it is apparent that it cannot be relied on in all cases, *to the exclusion of other legitimate evidence*." (*Id.* at p. 432, italics added.)[14] The "other legitimate evidence" at issue in *Karasek* was the defendant's testimony about his purported purpose in erecting a fence that was admittedly taller than necessary to achieve his stated purposes. (*Karasek v. Peier, supra,* 22 Wash. at pp. 431-432.)

---

[14]    The Vanderpols' brief did not quote the "other legitimate evidence" qualification to the *Karasek* rule they propose.

26

Based on our reading of *Wilson* and *Karasek*, we conclude the dominant purpose test relates to the defendant's subjective intent in erecting or maintaining the fence or fence-like structure.  This is not to say objective motivating factors are irrelevant to the court's analysis.  As one case cited by the Vanderpols observes, "[s]ince parties rarely admit an improper motive, malice is usually proven by circumstantial evidence and inferences drawn from the evidence."  (*HMS Capital, Inc. v. Lawyers Title Co*. (2004) 118 Cal.App.4th 204, 218 [discussing the malice element of the malicious prosecution tort, which " 'goes to the defendant's *subjective intent*' " (italics added)].)[15]  But we decline to adopt a rule that would require objective or circumstantial evidence of intent while at the same time categorically excluding an entire category of direct evidence of subjective intent.

C. *The Trial Court's Application of the Dominant Purpose Test Is Supported by Substantial Evidence*

Having concluded the trial court selected the correct legal rule, we review for substantial evidence the Vanderpols' challenges to the court's application of that rule in ascertaining the Starrs' dominant purpose.  (*Crocker*, *supra*, 49 Cal.3d at p. 888.)  Under

---

[15]    As the Vanderpols suggest, the selection of a species of tree specifically because it is capable of growing to a height that will block the plaintiff's view *can* be a piece of circumstantial evidence that contributes to a finding that the defendant's dominant purpose is malicious. (E.g., *Dowdell v. Bloomquist* (R.I. 2004) 847 A.2d 827, 829, fn. 5 [defendant planted a row of trees capable of growing to a height of 70 feet].)  But it does not, standing alone, *compel* the trier of fact to reach that conclusion, as the Vanderpols imply.  If that were the case, there would have been no need for the *Wilson* court to remand for a new trial where the defendant had planted trees that, "if . . . allowed to grow unabated, . . . would eventually block both plaintiffs' views of Mount Shasta."  (*Wilson*, *supra*, 97 Cal.App.4th at p. 1305.)

this standard, "the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Grainger v. Antoyan* (1957) 48 Cal.2d 805, 807.) We are required to accept all evidence that supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the verdict. (*Minelian v. Manzella* (1989) 215 Cal.App.3d 457, 463.) Thus, it is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766; see *Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) Our review is not limited to appraising " 'isolated bits of evidence selected by the [appellant].' " (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873.) Instead, "[t]he ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.) Finally, because the Vanderpols did not timely request a statement of decision, the doctrine of implied findings requires us to infer the trial court made all factual findings necessary to support the judgment. (*C9 Ventures v. SVC-West, L.P., supra,* 202 Cal.App.4th at p. 1499.)

The root of the Vanderpols' challenge is their claim that the court erred by examining the trees in their current condition without regard to the fact that the subsequently planted cypress trees could eventually grow to heights that would block the

28

Vanderpols' view. However, we conclude the trial court's finding of dominant purpose is supported by substantial evidence.

Contrary to the Vanderpols' claim that "the trial court indicated that it did not consider the [Starrs'] action of planting the additional [c]ypress trees in its determination," the trial court's Verdict expressly references them:

> "The Court is persuaded that the reduction in view causes annoyance to the [Plaintiffs], and that it substantially interferes with [Plaintiffs'] enjoyment of the property. However, the Court is not persuaded that maintenance of the trees, *as currently and historically evidenced* by photographs, is done for the dominant purpose of annoying or vexing Plaintiffs. Instead, the photographs introduced into evidence establish that the trimming performed in 2002 was so substantial and invasive that it is not unreasonable for a property owner to withdraw consent to further trimming by the upslope neighbor. *Defendants are cautioned, however, that allowing the subsequently planted trees to grow in the future to a height in excess of the previously existing pepper trees would likely change the Court's analysis.*" (Italics added.)

At the hearing on the Vanderpols' motion for new trial, based in part on the argument that the trial court failed to consider the subsequently planted trees, the court explained at length why its Verdict referenced the subsequently planted trees:

> "And I noticed in this motion that the plaintiff has attached pictures showing the new cypress trees growing, but those trees are shown from ground level. In the photographs that are shown from the upper levels of the house, the cypress trees don't show as high. In any event, the cypress tree issue wasn't really the one that was before the Court in either trial, although it became [a part] of it. And perhaps in my desire to try and temper the defendant's future conduct, I perhaps gave the wrong impression.
>
> "I'm not going to go back and revisit it, the pepper trees [sic] grow in this case, I'm not going to continue jurisdiction in this neighborhood dispute forever. *What I didn't want to have happen was that the*

29

*defendants feeling bullied by the Court's decision on the issues that were before it, then decide, well, now we can really let everything grow, and now we're going to have the purpose of annoying our neighbor, and therefore they let these trees grow to an extreme height, that's unreasonable.* Nothing in my ruling would prevent the plaintiffs from pursuing that case. And I don't want the judge who has to make that decision to look back and say, well, Maas already said these can't form a basis for opinion, and I'm not going to overrule that.

"If there's new facts or circumstances or things that indicate the defendants are, in fact, developing a spite fence, have at it at a later time. I don't necessarily think it's a good use of their resources. It's not precluded by my case.

"But from my perspective, even looking at the photographs that are provided now, there is clearly now a less than pleasant relationship between the two parties. *The plaintiff having stripped the lower portions of the eucalyptus trees of all the growth, such that now the growth comes at a higher level, it makes perfect sense to me that the defendants grow other things at the lower levels to preserve their privacy, their shade, et cetera, et cetera.*

"And whether it was the dominant purpose test, which I already ruled on, or anything else, my impression from everything here was that the defendants don't want the plaintiffs looking down into their property. They like having some shade when the sun grows [sic] up that way over their property. And whether or not I would want shade in those circumstances is irrelevant. They do, and it was reasonable. (Italics added.)

This record makes clear that the trial court considered the subsequently planted cypress trees *and their potential growth* in its dominant purpose analysis. That the court did not reach the conclusion the Vanderpols wanted does not mean the court's conclusion was unreasonable. Rather, the court could reasonably have credited the Starrs' testimony that they enjoyed the beauty, shade, and aroma of the eucalyptus trees and desired a privacy screen of cypress trees necessitated by the loss of privacy that resulted from the

30

Vanderpols' removal of their pepper trees and the excessive trimming and subsequent growth of the eucalyptus trees. That conclusion is all the more reasonable considering Eugene Vanderpol's concessions that: (1) Indra Starr told him before the 2004 incident that she enjoyed the smell of the eucalyptus trees; (2) the loss of foliage from the eucalyptus trees could interfere with Indra's enjoyment of their beauty; and (3) the cypress trees did not yet obstruct his view. The Vanderpols' citation of conflicting evidence on appeal does not undermine our substantial evidence review. (*Minelian v. Manzella*, *supra*, 215 Cal.App.3d at p. 463.) We conclude substantial evidence supports the trial court's determination that the Starrs' dominant purpose in allowing the eucalyptus trees to grow and in subsequently planting cypress trees was not to annoy or vex the Vanderpols.

DISPOSITION

The judgment is affirmed. The Starrs are entitled to costs on appeal.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

McINTYRE, J.