[No. D056599. Fourth Dist., Div. One. Apr. 15, 2011.]

EUGENE VANDERPOL et al., Plaintiffs, Cross-defendants and Respondents, v.
FRED STARR et al., Defendants, Cross-complainants and Appellants.

**COUNSEL**

Law Office of Eric L. Hoffland, Eric Lauren Hoffland; Dicks & Workman, Joseph G. Dicks and Linda Workman for Defendants, Cross-complainants and Appellants.

Manning & Marder, Kass, Ellrod, Ramirez, Trester, Manning & Kass, Ellrod, Ramirez, Trester, John D. Marino, Darin L. Wessel and Christopher R. Allison for Plaintiffs, Cross-defendants and Respondents.

**OPINION**

**BENKE, Acting P. J.—**

## OVERVIEW

This case involves a dispute between adjoining property owners over trees at or near their common border. Appellants Fred Starr (Fred) and Indra Starr (Indra) (together, the Starrs) own residential real property located at 7204 Babilonia Street, Carlsbad, California (Starrs' property). The Starrs purchased their home in 1998.

Respondents Eugene Vanderpol (Eugene) and Jenny Vanderpol (Jenny) (together, the Vanderpols) own residential real property located at 7165

Obelisco Circle, Carlsbad, California (Vanderpols' property). The Vanderpols purchased their home in 2000.

The Vanderpols sued the Starrs in 2009, alleging the Starrs "wrongfully maintained, planted and/or installed numerous trees, shrubs and/or similar plants . . . near the common property line [of the parties] at such a height and density so as to be annoying and damaging to [the Vanderpols]." The Vanderpols alleged a cause of action for private nuisance based on California's "spite fence" statute, Civil Code[1] section 841.4, and based on ordinary nuisance principles, sections 3479 and 3481, and sought injunctive and declaratory relief in their second and third causes of action, respectively.

In the special verdict form under the rubric of "Spite Fence Statute," the jury found in question No. 1 that the Starrs were "maliciously maintaining trees that unnecessarily exceed 10 feet for the dominant purpose of annoying [the Vanderpols]." The jury next found in question No. 2 that the Starrs' conduct was a "substantial factor in causing harm" to the Vanderpols.

In question No. 3 under the rubric of "Nuisance," the jury found that the Starrs did *not* "create a condition that was an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." During its deliberations, the jury specifically asked whether question No. 3 of the special verdict "applie[d] to leaves, debris, and/or view?" Counsel of the parties stipulated that question No. 3 applied only to "leaves and debris, *not* view," and the jury was instructed accordingly. (Italics added.)

Despite the jury's finding on question No. 3, the verdict form directed the jury to question No. 9 to determine damages, if any. The jury awarded the Vanderpols $57,000 for their "[p]ast economic loss" based on the "lost value of property," but refused to award any damages for "other past economic loss" or for "[p]ast noneconomic loss, including inconvenience and emotional distress."

At a subsequent hearing, the trial court relied on the jury's findings to enjoin the Starrs from maintaining any of their trees situated along the parties' property line "at a height in excess of fifteen feet, nine inches, when measured from the base of the tree to the top of each tree, for a period of more than thirty (30) consecutive days" as long as the Starrs "own or control for their benefit" their property.

The trial court, sitting in equity, issued the injunction and stated the Vanderpols would not get the damages awarded by the jury because with the

---

[1] All statutory references are to the Civil Code unless otherwise noted.

trees trimmed as required by the injunction there would be no change in the market value of the Vanderpols' property.

On appeal, the Starrs contend the trial court erred when it entered judgment and a permanent injunction against them because the Vanderpols failed to prove they sustained a legally cognizable injury for purposes of sections 841.4 and 3479. The Starrs also contend for the first time in their *reply brief* that a row of trees cannot constitute a spite fence within the meaning of section 841.4.[2]

The Vanderpols contend that once the jury made true findings on questions Nos. 1 and 2 of the special verdict, they established a "nuisance per se" under a "spite fence theory" and thus were entitled to damages and injunctive relief.

As we explain, our interpretation of California's spite fence statute leads us to conclude (i) a row of trees can be a "structure in the nature of a fence" for purposes of section 841.4 and (ii) the special verdict was defective and, therefore, the Vanderpols did not satisfy the injury requirement under that statute. As such, the Vanderpols were not entitled to damages or injunctive relief based on the Starrs' maintenance, or lack thereof, of the trees.

## BACKGROUND

The rear of the Vanderpols' property runs along the northern, rear border of the Starrs' property. The houses are situated on a hillside, with the Starrs' property located below the Vanderpols' property. Both houses have views of the Pacific Ocean.

When the Vanderpols purchased their home, they observed eucalyptus trees (trees) on the Starrs' property below. However, the trees then did not block their view and, in any event, the then owner of the property indicated there was an arrangement with the property owner below to keep the trees trimmed to heights that would not disrupt the view. Eugene estimated the trees were then about nine to 12 feet tall and then observed the trees had recently been

---

[2] Because the Starrs waited until their reply brief to raise this issue on appeal and provided no explanation for not addressing it in their opening brief, we typically would decline to consider it because they deprived the Vanderpols of the opportunity to respond. (See *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 [13 Cal.Rptr.2d 432] ["[p]oints raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument"]; *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788] [" '[T]he rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.' "].) However, in light of our decision to reverse and remand this case for a new trial, we conclude it is necessary to reach this issue, which we discuss *post*.

trimmed. Fred testified at trial that they had in fact trimmed the trees in 1999, shortly after they moved into their property.

In June 2001, Eugene approached the Starrs about trimming the trees. At a subsequent meeting at the Vanderpols' house, Indra said she did not want the trees trimmed to the point where she could see the Vanderpols' "big ugly house" or words to that effect.[3] The Starrs agreed the trees could be trimmed at the Vanderpols' cost, but insisted the trimmer be bonded and licensed.

The trees were trimmed in July 2001. On that day, Eugene met the Starrs in their backyard to discuss the trimming. Eugene gave his input where to trim, but it was Indra who directed the trimmers regarding the trees to be trimmed and how much should be taken off the tops and sides of the trees. At some point, Eugene spoke to one of the trimmers in charge and directed him to "just do what [Indra] says." The trees were trimmed back to a uniform height of 14 feet.

About a year later, Eugene again contacted Indra about trimming the trees. Indra agreed to allow the trimming, but said she wanted it done when she was home by the same licensed and bonded trimmer who had trimmed the trees the year before. According to Eugene, Indra was present when the trimmers arrived, and she instructed the trimmers to cut the trees in the same manner and to the same height as before.[4] At the conclusion of the trimming, Eugene and Indra thanked each other and gave each other a "thumbs up" as they walked back to their respective properties.

In mid-July 2004, Eugene again contacted Indra regarding trimming the trees.[5] They agreed the trimming would take place on a Saturday in late July, with the trimming to be done by the same crew "exactly" as it had been done in the past. When the trimmers arrived, Eugene telephoned the Starrs and

---

[3] Indra testified it was "very clear" in her mind that she was *not* present with her husband at this meeting with Eugene. Fred testified at his deposition she was present for the meeting, but at trial testified he was not sure. Although there is a conflict in the evidence, on appeal we are required to "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by [the reviewing] court. [Citations.]" (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813]; see also *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 582 [84 Cal.Rptr.3d 285] ["If the record demonstrates substantial evidence in support of the judgment, we must affirm even if there is substantial contrary evidence. [Citation.]"].)

[4] Indra testified that she was *not* home when the trees were trimmed in 2002, that when she and Fred arrived home that day they "were very perplexed the trees were cut really short," and that as much as 20 feet had been taken off the tops of some of the trees.

[5] In 2002, Eugene approached Indra about installing a hedge in place of the trees. Despite the fact Eugene agreed to pay for the hedge, Indra rejected the idea because she said she liked the smell of eucalyptus.

spoke to their daughter who said, "Come down. Can we speak about the trees that need to be trimmed?" As he had done in the past, Eugene went to the far corner of the lot and jumped the chain-link fence where there was a pathway to the Starrs' house. Eugene estimated it was about a half-mile walk from his home to the Starrs' house if he went by street.

When Indra and Eugene met on the Starrs' property, Indra told Eugene she would only allow a few trees in the corner of her lot to be trimmed two or three feet off the top. Eugene responded that was not what he and Indra had agreed on, that he already had given the trimming crew a deposit and the crew was ready to trim the trees the same as before and that she was going back on her word. Their conversation intensified when Indra called Eugene a "bully" and said she knew how to "deal" with bullies. At some point, Indra demanded that Eugene get off her property and threatened to call the police on him. Eugene instead called the police after Indra threatened his pets.[6] Jenny was upstairs in the house with the couple's baby when she heard shouting, looked outside and saw Indra screaming at her husband Eugene in the Starrs' backyard.

About a month after the July 2004 disagreement, the Starrs began planting myriad new trees along the parties' common border, including up to 20 pine trees and 65 Italian cypresses (new trees). Indra testified they planted the new trees for privacy because the existing trees then did not provide a visual screen between their property and the Vanderpols' property.

In 2007, the Vanderpols' legal counsel notified the Starrs that their trees were obstructing the Vanderpols' view and annoying the Vanderpols, and advised the Starrs to trim their trees. Eugene estimated the trees were then four to five times taller than when he and his wife first saw the property in 2000. The Starrs, however, did not trim their trees. Indra estimated that in early 2009 the trees were about the same height as when they first moved into their house, roughly 40 to 50 feet high, with the taller trees located at the corner of the parties' property line.

At trial, the Vanderpols' appraisal expert testified he prepared a "letter of value" and found the "value loss" from the view obstruction caused by the Starrs' trees was $57,000. The expert reached this valuation by comparing the value of the Vanderpols' property with the obstructed view to the value of the property if the view was unobstructed, as determined at the time of trial. The $57,000 figure did not include the Vanderpols' loss of enjoyment of the view.

---

[6] Not surprisingly, Indra's testimony regarding this event varied substantially from Eugene's testimony. The Starrs' two children also testified about this event, as both were at home at the time. Both children testified that Eugene, and not their mother, was the aggressor in the dispute.

In addition to the value loss of their property from the obstruction, the Vanderpols alleged the Starrs' trees also deposited leaves and debris on the Vanderpols' property, causing staining of their concrete and clogging of their pool filter. The deposited leaves and debris were the basis for the Vanderpols' general nuisance claim against the Starrs.

## DISCUSSION

### A. *Rules of Statutory Construction and Standard of Review*

█ We review de novo questions of statutory construction. (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 387 [97 Cal.Rptr.3d 464, 212 P.3d 736].) The overarching principle governing the interpretation of a statute is to determine and effectuate the Legislature's intent. (*California Teachers Assn. v. Governing Bd. of Golden Valley Unified School Dist.* (2002) 98 Cal.App.4th 369, 375 [119 Cal.Rptr.2d 642]; Code Civ. Proc., § 1859.) We first examine the language of a statute, as it tends to provide the "most reliable indicator" of legislative intent. (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 871 [39 Cal.Rptr.2d 824, 891 P.2d 804].) The words of a statute are given their usual and ordinary meaning (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]) and construed in light of the statute as a whole and the statute's purpose (*Walker v. Superior Court* (1998) 47 Cal.3d 112, 124 [253 Cal.Rptr. 1, 763 P.2d 852]).

"If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." (*People v. Snook* (1997) 16 Cal.4th 1210, 1215 [69 Cal.Rptr.2d 615, 947 P.2d 808].) "Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation." (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103 [56 Cal.Rptr.3d 880, 155 P.3d 284].) We thus turn to the words of section 841.4.

### B. *Section 841.4*

This statute provides: "Any fence or other structure in the nature of a fence unnecessarily exceeding 10 feet in height maliciously erected or maintained for the purpose of annoying the owner or occupant of adjoining property is a private nuisance. Any owner or occupant of adjoining property injured either

in his comfort or the enjoyment of his estate by such nuisance may enforce the remedies against its continuance prescribed in Title 3, Part 3, Division 4 of this code."[7]

The Starrs contend the trial court erred when it entered judgment and a permanent injunction against them under section 841.4 because the Vanderpols failed to prove they sustained injury as required by section 841.4. The Starrs also contend (in their *reply brief*)[8] that it is an "open question" in California whether a row of trees can be a "structure in the nature of a fence" for purposes of section 841.4. We turn first to their latter contention, which is a threshold issue in this case.

C.   *Whether a Row of Trees Is a "Structure in the Nature of a Fence"*

The Third District Court of Appeal in *Wilson v. Handley* (2002) 97 Cal.App.4th 1301, 1309 [119 Cal.Rptr.2d 263], concluded a "row of trees planted on or near the boundary line between adjoining parcels of land can be a 'fence or *other structure in the nature of a fence*' " for purposes of section 841.4. (Italics added.) In reaching its decision, the court in *Wilson v. Handley* thoroughly reviewed the history and purpose of spite fence statutes in the United States, including the predecessor of section 841.4.

*Wilson v. Handley* teaches the spite fence statutes grew out of an increasing awareness in the late 1800's that a property owner's right to use his or her land was not unlimited. Various states enacted such statutes to prevent an owner from building a structure or fence that was unnecessarily high and that needlessly interfered with his or her neighbor's light and air. (*Wilson v. Handley, supra*, 97 Cal.App.4th at p. 1308.) Our Legislature in the early 1900's "joined a growing number of states and adopted the current spite fence statute . . . declaring it a private nuisance to maliciously erect or maintain '[a]ny fence or other structure in the nature of a fence, unnecessarily exceeding ten feet in height . . . for the purpose of annoying the owner or occupants of adjoining property . . . .' [Citation.]" (*Id.* at pp. 1308–1309.)

The court in *Wilson v. Handley* adopted a plain and commonsense meaning of the term "structure" in section 841.4, broadly defining the word as

---

[7] This reference in section 841.4 to division 4, part 3, title 3, is to section 3501 through section 3503. Section 3501 provides: "The remedies against a private nuisance are: [¶] 1. A civil action; or, [¶] 2. Abatement." Section 3502, discussed *post*, states: "A person injured by a private nuisance may abate it by removing, or, if necessary, destroying the thing which constitutes the nuisance, without committing a breach of the peace, or doing unnecessary injury." Finally, section 3503 provides: "Where a private nuisance results from a mere omission of the wrongdoer, and cannot be abated without entering upon his land, reasonable notice must be given to him before entering to abate it."

[8] See footnote 2, *ante*.

" 'something arranged in a definite pattern of organization.' [Citation.]" (*Wilson v. Handley, supra*, 97 Cal.App.4th at p. 1306.) Based on that definition, the court had little difficulty concluding a row of trees, as opposed to a single tree, could constitute a "structure" within the meaning of section 841.4. (97 Cal.App.4th at p. 1306.)

The court next addressed whether a row of trees can be a structure "in the nature of a fence." The court noted the definition of the word "fence" included a " 'structure . . . erected . . . to separate two contiguous estates' " or " 'a barrier intended . . . to mark a boundary' [citation]." (*Wilson v. Handley, supra*, 97 Cal.App.4th at p. 1307.) Because spite fence statutes, including section 841.4, "were enacted to prevent what would otherwise be the lawful practice of a landowner erecting or maintaining an unnecessarily high barrier between his or her property and an adjoining property to annoy the neighboring landowner," the court concluded a row of trees planted and/or maintained at or near the boundary line between adjoining parcels of land can be a " 'structure in the nature of a fence' " for purposes of section 841.4. (97 Cal.App.4th at p. 1309.)

■ We find the reasoning of *Wilson v. Handley* persuasive and agree with that court's decision on this issue. If the rule were otherwise, we potentially would be creating an exception to the statute that could swallow the rule. Indeed, unlike a fence, trees grow and certain trees can grow very quickly, as the instant case shows. As the instant case also shows, like a fence, a row of trees often serves as a barrier between adjoining property owners. Like the court in *Wilson v. Handley*, we conclude that a row of trees serving as a barrier between adjoining parcels of land can satisfy the statutory language of a "structure in the nature of a fence" under section 841.4.

### D. *The Injury Requirement Under Section 841.4*

In the instant case, the jury made findings in the verdict form that the Starrs maliciously maintained trees that unnecessarily exceeded 10 feet in height for the dominant purpose of annoying the Vanderpols. However, section 841.4 requires more, and therein lies the problem: the jury here was never asked to determine whether the Vanderpols sustained *injury* in their "*comfort or the enjoyment of [their] estate by such nuisance*" as required by the plain language of section 841.4. (Italics added.)

The Vanderpols argue the jury found they sustained "*injury* by virtue of [its] answer to Question [No.] 2." (Italics added.) We disagree. Question No. 2 does not establish injury, but instead goes to the issue of *causation*, as the Starrs' own counsel noted during the injunction hearing following trial:

"[Starrs' counsel]: In this particular case, the jury answered in the affirmative to both questions one and two in the verdict form. Those are very critical

to the court's determination in this particular hearing. In that, question number one establishes liability, and question number two establishes *causation*." (Italics added.)

The jury also was instructed with CACI No. 430, titled: "*CAUSATION*: SUBSTANTIAL FACTOR." (Italics added.) CACI No. 430 provides: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] [Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.]"

Thus, it is clear from the record that special verdict question No. 2 went to the issue of causation and not injury.

The Vanderpols also argue the jury's true finding to question No. 1 of the verdict established *liability* for purposes of section 841.4. Again, we disagree.

█ If, as the Vanderpols allege, damages and injunctive relief were available to an owner or occupant of adjoining property *without* a finding of injury in his or her "comfort" or "enjoyment" of his or her estate "by such nuisance," this language in section 841.4 would be rendered mere surplusage. (See *Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 24 [157 Cal.Rptr. 706, 598 P.2d 866] [in construing a statute a court seeks to avoid an interpretation that renders a statute or ordinance "superfluous in whole or in part"]; *Brewer v. Patel* (1993) 20 Cal.App.4th 1017, 1021 [25 Cal.Rptr.2d 65] [same].) We thus reject the argument of the Vanderpols that they proved liability for purposes of section 841.4 without an injury finding.

Here, unfortunately for the Vanderpols, the special verdict neglected to ask the jury to determine whether the Vanderpols were injured "by such nuisance" in the "comfort" or "enjoyment" of their property. (§ 841.4.) Although the jury was asked in question No. 3 of the verdict to find whether the Starrs' conduct created a condition "that was an obstruction to the free use of property," such that the condition interfered "with the comfortable enjoyment of life or property," during deliberations counsel stipulated question No. 3 involved only leaves and debris *and not view*.

█ Our conclusion that a plaintiff must still prove *injury* to the "comfort" or "enjoyment" of his or her estate to recover under section 841.4 is supported by related statutes governing nuisance actions generally. (See *Kalway v. City of Berkeley* (2007) 151 Cal.App.4th 827, 833 [60 Cal.Rptr.3d 477] [" '[A] statute is not to be read in isolation; it must be construed with *related statutes* and considered in the context of the statutory framework as a whole.' " (italics added)].)

■ For example, section 3502, which is one of the statutes in division 4, part 3, title 3 referenced in section 841.4, requires a person to be "injured by a private nuisance" in order to abate the nuisance. (§ 3502 ["A person *injured by a private nuisance* may abate it by removing, or, if necessary, destroying the thing which constitutes the nuisance . . . ." (italics added)].) Thus, under section 3502, without injury a party cannot move to abate the nuisance.

Similarly, the Vanderpols relied on Code of Civil Procedure section 731 during the injunction hearing when they argued they were entitled to abatement. We note, however, that under Code of Civil Procedure section 731 the Vanderpols were still required to show that their property was "injuriously affected" or their "personal enjoyment lessened" by the nuisance. (See Code Civ. Proc., § 731 ["An action may be brought by any person whose property is *injuriously affected, or whose personal enjoyment is lessened by a nuisance,* as defined in Section 3479 of the Civil Code, and by the judgment in that action the nuisance may be enjoined or abated as well as damages recovered therefor."].) Without either showing, under the plain language of this statute a person is not entitled to abatement or damages.

■ We also are unwilling to imply a finding of "injury" to the Vanderpols in their "comfort" or "enjoyment" of their property "by such nuisance." " 'Unlike a general verdict (which merely *implies* findings on all issues in favor of the plaintiff or defendant), a special verdict presents to the jury each ultimate fact in the case. The jury must resolve all of the ultimate facts presented to it in the special verdict, so that "nothing shall remain to the court but to draw from them conclusions of law." (Code Civ. Proc., § 624.) [¶] The requirement that the jury must resolve every controverted issue is one of the recognized pitfalls of special verdicts. "[T]he possibility of a defective or incomplete special verdict, or possibly no verdict at all, is much greater than with a general verdict that is tested by special findings . . . ." [Citation.]' " (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 959–960 [17 Cal.Rptr.2d 242]; accord, *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092 [74 Cal.Rptr.3d 235] [unlike a general verdict or a general verdict with special findings, with a special verdict a reviewing court will not infer findings to support the verdict].)

As we have noted, the jury was not asked in the special verdict whether the Vanderpols were injured in their comfort or enjoyment by the nuisance/trees. The special verdict is therefore defective on its face. (See *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678 [24 Cal.Rptr.3d 338] [a general verdict implies findings on all issues in one party's favor, whereas a special verdict requires the jury to resolve all of the controverted issues in the case].)

Even so, the jury awarded damages of $57,000 to the Vanderpols for "[p]ast economic loss" based on the "lost value of property." Thus, the jury did not award the Vanderpols any damages for injury to their "comfort" or "enjoyment" of their property, and in fact specifically found the Vanderpols were not entitled to any damages for "noneconomic loss, including inconvenience and emotional distress." In addition, the Vanderpols' appraisal expert testified his $57,000 damage figure, which the jury adopted, did *not* include the Vanderpols' loss of enjoyment of their view. Thus, for this separate and independent reason we conclude the jury did not make a determination that the trees injured the Vanderpols in their comfort or enjoyment of their property, as required by section 841.4.

We also reject the Vanderpols' argument that as a court of equity the trial court had the authority to access independently the evidence, accept or reject the findings of the jury, and make its own findings irrespective of those by the jury in ruling on the Vanderpols' request for permanent injunction. Indeed, the record shows that at the injunction hearing, counsel for the Vanderpols argued the "evidentiary matters have already been decided, and we're here today to request relief from the court based on the *jury's* determination." (Italics added.) Thus, at no time did the Vanderpols ask the trial court, sitting as a court of equity, to make its own independent findings, including the finding that the Vanderpols sustained injury to the comfort or enjoyment of their property from the Starrs' trees.

Finally, we conclude the Vanderpols were not entitled to any relief under the general nuisance statutes, sections 3479 and 3481. The Vanderpols admit in their brief they relied on this theory of liability only with respect to debris and leaves falling from the trees onto their property. In any event, the jury in question No. 3 of the special verdict found against the Vanderpols on a general nuisance theory when it determined the Starrs did not create a condition that was an "obstruction to the free use of property, so as to interfere with the [Vanderpols'] comfortable enjoyment of life or property."

In light of our opinion, we deem it unnecessary to decide whether the jury's findings in questions Nos. 1 and 2 of the special verdict were supported by substantial evidence in the record or whether the private nuisance from the trees was continuing or permanent.

## DISPOSITION

The jury found the Starrs maliciously maintained trees that unnecessarily exceeded 10 feet for the dominant purpose of annoying the Vanderpols. However, the jury did not find, nor was it asked to find, in the special verdict that the Vanderpols were injured in either their comfort or enjoyment of their

property, as also required by section 841.4. Sitting as a court of equity, the trial court also was never asked to make, nor made, such a finding or findings. We thus reverse the judgment and permanent injunction and remand for new trial consistent with this opinion. Each party to bear their own costs of appeal.

McDonald, J., and McIntyre, J., concurred.

A petition for a rehearing was denied May 3, 2011, and on April 21, 2011, and May 3, 2011, the opinion was modified to read as printed above.