Filed 6/27/16  Bokkes v. Plotkin CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TOMMY BOKKES et al., | |
| Plaintiffs and Appellants, | G052085 |
| v. | (Super. Ct. No. 30-2011-00525362) |
| PETER PLOTKIN, Individually and as Trustee, etc., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Robert D. Monarch, Judge.  Affirmed.

Amezcua-Moll & Associates, Rosemary Amezcua-Moll, Sarah J. Nowels and Andrew Mase for Plaintiffs and Appellants.

Gordon & Rees, Richard P. Sybert and Nathaniel J. Tarvin for Defendant and Respondent Peter Plotkin.

Callanan, Rogers & Dzida and Joseph S. Dzida for Defendants and Respondents Isaac Khokher and Raymond Pablo.

\*     \*     \*

**INTRODUCTION**

Tommy Bokkes and his daughter, Adeline, appeal from a defense judgment entered after a jury trial. Appellants alleged respondents, Peter Plotkin, Isaac Khokher, and Raymond Pablo, were responsible for flooding in a commercial building Bokkes rented from Plotkin. Pablo owned a company that managed Plotkin's properties, and Khokher was a company employee who collected the rent. It was alleged that all three knew about a leaky pipe that ultimately burst, causing the flood, but did nothing about it. The flood allegedly caused mold growth in the building, which in turn caused appellants to develop severe allergic reactions. The flood also was alleged to have damaged property used in the Mercedes automobile service facility Bokkes operated out of the rented premises.

The defendants made a series of in limine motions, four of which are at issue in this appeal. The most important ones sought to exclude a professionally prepared mold report and to exclude plaintiffs' medical expert. The court granted both motions. As a result, just before trial the case ceased to be a personal injury lawsuit and became one primarily for property damage and fraud.

By special verdict, the jury found that Plotkin, Khokher, and Pablo had been negligent and had created a nuisance; they were, in essence, responsible for the occurrence of the flood. The jury found, however, that none of the defendants' actions had harmed Bokkes. This finding was presumably based on the fact that before the flooding occurred, Bokkes had transferred all of the property used to operate his Mercedes service facility to a corporation, and the corporation was not a party to the lawsuit. The trial court had denied Bokkes' last-minute oral motion to amend the

2

complaint for the seventh time to add the corporation as a plaintiff, so none of the property damaged in the flood belonged to a plaintiff.

Appellants have identified the exclusion of four items of evidence as erroneous. We have already alluded to the mold report and the medical expert. The other two items were (1) a statement made by Plotkin during his deposition and (2) the lack of real estate broker's licenses for all respondents. Appellants have also identified the trial court's refusal to allow Bokkes to amend the complaint as error.

We affirm the judgment. The trial court did not abuse its discretion in excluding the mold report and the medical expert. The court had a gatekeeping function to assure that the scientific and medical evidence presented to the jury had a sound footing, and we cannot say the court's decisions on these subjects exceeded the bounds of reason. Even if the other two pieces of evidence were wrongly excluded, appellants have not shown prejudice. Nor did the court abuse its discretion when it refused to permit an eleventh-hour request to amend the complaint to add the corporation as a new plaintiff. The evidence of potential prejudice from such an amendment was strong, and the explanation in the record for delay is non-existent. The trial court was within its discretion to refuse to allow Bokkes to amend the complaint a seventh time.

## FACTS

In 1995, Bokkes and this then-wife, Karen Bokkes, leased a commercial building owned by Plotkin in Lake Forest.[1] Bokkes ran his Mercedes automobile service business out of the building. The lease had a five-year term and provided that at its expiration, Bokkes and his wife would be considered holdover tenants.

In 2008, Bokkes incorporated the business as Bokkes Independent Mercedes Service, Inc., and in January 2009, he transferred all the business property to

---

[1] The basic lease was a preprinted form, but several handwritten additions and changes were made to its terms.

3

the corporation. He did not, however, transfer the lease (now a month-to-month agreement); the tenants remained Bokkes and his now-ex-wife individually.

In January 2010, a pipe that supplied water to a fire sprinkler system failed and flooded the premises occupied by Bokkes Independent Mercedes Service. Bokkes had repeatedly – over a period of years – warned Khokher the pipe was about to give out, but to no avail.[2] Afterward, Bokkes cleaned up the premises to some extent, but Plotkin put off doing a thorough cleaning because he planned to sell the building. Bokkes complained to Khokher and Pablo about the failure to clean up, and, in May 2011, he hired a company to test for mold on the property. Finally, in July 2011, he moved out of the building altogether.

The original complaint was filed in November 2011. In the sixth amended complaint, filed in July 2014, plaintiffs alleged that mold began growing in the building because of the flood and that Bokkes and his young daughter, Adeline, developed respiratory and other symptoms as a result of being exposed to the mold. The causes of action in the sixth amended complaint were breach of lease, breach of the implied covenant of good faith and fair dealing, negligence, nuisance, constructive eviction, return of security deposit, intentional infliction of emotional distress, and fraud. The plaintiffs were Bokkes and Adeline; the defendants were Plotkin, Khokher, and Pablo. Plotkin cross-complained for, inter alia, nonpayment of rent.

In August 2014, the defendants made 13 motions in limine, four of which are at issue in this appeal. One motion sought to exclude the mold report prepared in May 2011, by EMLab P & K (EMLab). Another sought to exclude the testimony of Dr. John Chiu, an allergist who was scheduled to testify as an expert that Bokkes and Adeline had developed mold allergies and allergic reactions as a result of their exposure to the

---

[2]     Respondent Pablo owned a property management business, RRP Co., which employed Khokher. Plotkin was not directly involved in managing the property. Khokher was Bokkes' point of contact with the property manager. Pablo met Bokkes and visited the premises only on the occasion of the flood.

4

mold growing in the building because of the flood. A third motion sought to exclude evidence of a statement made by Plotkin in his deposition to the effect that he, as landlord, was responsible for maintaining improvements which included the failed pipe. The last motion sought to exclude evidence that Plotkin, Khokher, and Pablo did not have real estate broker's licenses.

The trial court heard these motions and held hearings under Evidence Code section 402 prior to the commencement of trial.[3] All four motions were granted. The mold evidence thereupon dropped out of the lawsuit. As all of her causes of action were founded on exposure to mold, Adeline was dismissed through a motion for nonsuit.

Opening statements took place on September 25, 2014; trial testimony took eight days, spread out over two weeks. On October 16, after all parties had rested, Bokkes sought leave of the court to amend the complaint to name his corporation as an additional plaintiff. Having testified that the property damaged in the flood belonged to the corporation, Bokkes now realized that claims for damage to that property were in jeopardy. The court denied this motion the next day. Closing arguments began on the following Monday, October 20.

By special verdict, the jury found (1) Plotkin, Khokher, and Pablo were negligent, but their negligence was not a substantial factor in causing Bokkes harm; (2) Plotkin, Khokher, and Pablo negligently created a nuisance, but their conduct was not a substantial factor in causing Bokkes harm; (3) Plotkin did not constructively evict Bokkes; (4) the jury could not determine the amount of the security deposit that should be refunded to Bokkes; and (5) none of the defendants defrauded Bokkes. The jury found against Plotkin on his breach of contract cross-complaint. Judgment was entered on December 23, 2014. A motion for new trial was denied on July 15, 2015.

---

[3] All further statutory references are to the Evidence Code unless otherwise indicated.

5

**DISCUSSION**

Appellants have identified five issues on appeal. Four concern the exclusion of evidence. The last is the denial of Bokkes' motion to amend the complaint to include Bokkes Independent Mercedes Service as a plaintiff. We review all these issues for abuse of discretion. (*Brinkley v. Monterey Financial Services, Inc.* (2015) 242 Cal.App.4th 314, 336 [evidence]; *Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1091 [amend complaint].) As for the evidence issues, in addition to finding error, we must also determine whether the exclusion was prejudicial, that is, whether a better outcome could have resulted if the evidence had been presented to the jury. (§ 354; see *Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1449.)

**I.         Exclusion of the Mold Report**

In May 2011, Bokkes presented to Plotkin a mold report for the business premises, commissioned by him and prepared by Mold Inspection Sciences, Inc. EMLab performed the testing, on behalf of Mold Inspection Sciences.

The defendants moved to exclude the mold report on the grounds that (1) its introduction required expert testimony and plaintiffs had not designated an expert; (2) the report was hearsay; (3) the report could not be authenticated; (4) the report did not identify the relevant species of mold as having been found on the property; and (5) the report was more prejudicial than probative. The plaintiffs argued in opposition that the report was a business record admissible under section 1271. The trial court initially took the motion under submission. Later on during pretrial, there was an extensive discussion of the report.

Appellants advance several reasons they believe the trial court abused its discretion when it excluded the mold report. Chief among them: The mold report passed

the *Kelly*[4] test, and anyway the *Kelly* test did not apply; the report did not contain opinions requiring expert testimony, and even if it did, plaintiffs could call the defendants' expert to testify about them.[5]

Section 1271 provides, "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." "The proponent of the evidence has the burden of establishing trustworthiness. [Citations.] The trial court, however, has '. . . wide discretion in determining whether sufficient foundation is laid to qualify evidence as a business record. On appeal, exercise of that discretion can be overturned only upon a clear showing of abuse.' [Citation.]" (*People v. Beeler* (1995) 9 Cal.4th 953, 978-979.)

The trial court identified the trustworthiness of the mold report as an issue early in the pretrial process, having concluded the other three prongs of the business record exception had been established. The court returned to this theme many times before deciding the report's ultimate fate.[6]

A certified mold inspector from Mold Inspection Science testified under section 402 regarding the sampling process. He explained that he had taken the air and surface (swab) samples at the place of business, but that EMLab had done the actual

___

[4] This is the test formerly known as the *Kelly/Frye* test, but is now just the *Kelly* test, since the United States Supreme Court ruled that the Federal Rules of Evidence superseded *Frye v. United States* (D.C.Cir. 1923) 293 F. 1013. (See *People v. Cowan* (2010) 50 Cal.4th 401, 469, fn. 22.)

[5] The assertion in the opening brief that the court refused to allow the defendants' expert to so testify is without citation to the record.

[6] The court actually granted the first motion in limine, which was a motion to exclude mold evidence in general. The report itself was the subject of motion in limine number two. There is no question, however, that the court intended to exclude the mold report.

testing.  An EMLab representative testified regarding the testing procedures.[7]  Neither witness had been designated as an expert.  The defendants had a witness who testified under section 402 about taking air samples for mold.

To prepare the mold report, the tester took an air sample from two locations at the subject property by drawing air into a pump at a known rate.  Whatever was in the air at that location stuck to an adhesive installed in a cassette in the pump.  The cassette was then sealed up to prevent further contamination, and it was sent to the laboratory.  At the lab, a microscopist removed the adhesive, put it on a slide, stained and sealed it, and then counted the mold spores visible under the microscope.[8]  The microscopist also identified the types of spores visible in the sample.  A surface sample was also taken by running a sterile swab over some surface.  The lab used the same process to analyze what had stuck to the swab, but the ultimate findings differed somewhat from those of the air sample.

The report plaintiffs sought to introduce went well beyond counting spores.  The report not only contained the number of spores but also identified the types of mold from which the spores had originated.  It opined where the number of spores found fell in a low-to-high range and offered assessments of whether certain types of mold were growing in the building itself, as opposed from being transported there from outside.[9]

The mold report unquestionably contained material beyond what could qualify as a simple business record.  (See *People v. Ayers* (2005) 125 Cal.App.4th 988, 994 [report inadmissible as business record because it contained opinions and

_____

[7]       The witness had not analyzed the specific sample from the business property.

[8]       The defendants' witness testified that to qualify as a lab technician, a person had to have, at a minimum, a degree in one of the physical sciences that require the regular use of a microscope.

[9]       "A MoldSCORE™ rating of < 150 is low and indicates a low probability of spores originating inside.  A MoldSCORE™ rating of > 250 is high and indicates a high probability that the spores originated from inside, presumably from indoor mold growth."  The report went on to analyze the quantity and concentration of different types of spores.  For example, "This score indicates the likelihood that spores of *Cladosporium* present in the indoor sample originated from indoor sources.  A high rating indicates that there is probably a source of *Cladosporium* spores in this location."

8

conclusions]; *Taggart v. Super Seer Corp.* (1995) 33 Cal.App.4th 1697, 1708 [portion of reports constituting opinion correctly excluded].) "In every case the court must be guided by the general rules governing the use of expert testimony. If the fact sought to be proved is one within the general knowledge of laymen, expert testimony is not required; *otherwise the fact can be proved only by the opinions of experts*." (*Truman v. Vargas* (1969) 275 Cal.App.2d 976, 982, italics added.)

Although a tally of the number of spores counted might pass muster as part of a business record – assuming laymen handy with microscopes and able to tell a spore from a piece of dust – and perhaps an identification of the spores' shapes and colors as well, certainly identifying the types of spores by name, placing a spore concentration in a range between low and high, and concluding whether different kinds of mold are probably growing in a building are not within the general knowledge of laymen. Expert testimony was needed to present this evidence to the jury.[10] Plaintiffs did not designate an expert for this purpose.

The report was not exclusively opinion, but the court elected not to present a redacted version to the jury, probably foreseeing endless wrangling over what was opinion and what was not. And a redacted version, stripped of all opinion, would have been singularly unhelpful, at best telling the jury only that a certain number of different-looking spores had been found on the premises. We cannot say the trial court abused its discretion by excluding this report in the absence of an expert designated to testify about the opinions and conclusions it contained.

---

[10] As the court stated, "You have to breach [*sic*: bridge] the gap between an observation of a black substance and a conclusion that it's actually mold." "The analysis [of the air sample] may be a sound analysis; but from the standpoint of reaching that conclusion, the court's thinking is you need an expert to create the link between the records and that analysis."

9

**II.          Exclusion of Chiu's Testimony**

Chiu was plaintiffs' allergy expert, retained to examine Bokkes and Adeline for the litigation. He was not their treating physician. He was, in fact, plaintiffs' only expert.

The purpose of Chiu's testimony was twofold. First, he was slated to testify about Bokkes' and Adeline's allergic reactions – their symptoms and their treatment. Second, plaintiffs wanted to establish through him the relationship between their allergic reactions and the mold at the place of business. Chiu was supposed to testify that exposure to mold at the business caused the allergic reactions.

Although the trial court had no problem with the first topic of Chiu's testimony, it balked at the second. The court found that, given his testimony during the section 402 hearing, Chiu could not reliably testify about causation without the mold report, which had been excluded because it contained opinions requiring expert testimony. Chiu's ability to diagnose different allergies was not in question; it was his ability to attribute the cause of the allergies to the flood at the business premises that troubled the court.

The California Supreme Court set out a thorough explanation of the trial court's gatekeeping function with regard to expert opinions in *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*). The court stated, "[S]ection 801 provides: 'If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter . . . that is *of a type* that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion.' (Italics added.) Subdivision (b) clearly permits a court to determine whether the matter is of a *type* on which an expert may reasonably rely.

10

"In *Lockheed Litigation Cases* . . . , the plaintiffs argued that under . . . section 801, subdivision (b), 'a court should determine only whether the type of matter that an expert relies on in forming his or her opinion is the type of matter that an expert reasonably can rely on in forming an opinion, without regard to whether the matter relied on reasonably does support the particular opinion offered.' The Court of Appeal disagreed. 'An expert opinion has no value if its basis is unsound. [Citations.] Matter that provides a reasonable basis for one opinion does not necessarily provide a reasonable basis for another opinion. . . . [S]ection 801, subdivision (b), states that a court must determine whether the matter that the expert relies on is of a type that an expert reasonably can rely on "in forming an opinion *upon the subject to which his testimony relates*." (Italics added.) We construe this to mean that the matter relied on must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible.' [Citation.]

"We agree with this analysis. . . . Thus, under . . . section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion. As we recently explained, '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors … . [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?" [Citation.]' [Citations.]

"Additionally, . . . section 801 is not the only statute that governs the trial court's gatekeeping role. We must also consider . . . section 802. [Citation.] [S]ection 802 provides: 'A witness testifying in the form of an opinion may state . . . the *reasons* for his opinion and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. The court in its discretion may require that a witness before testifying in the form of an opinion be first examined

11

concerning the matter upon which his opinion is based.' (Italics added.) This section indicates the court may inquire into the expert's reasons for an opinion. It expressly permits the court to examine experts concerning the matter on which they base their opinion before admitting their testimony. The *reasons* for the experts' opinions are part of the matter on which they are based just as is the *type* of matter. [S]ection 801 governs judicial review of the *type* of matter; . . . section 802 governs judicial review of the *reasons* for the opinion. 'The stark contrast between the wording of the two statutes strongly suggests that although under section 801(b) the judge may consider only the acceptability of the generic type of information the expert relies on, the judge is not so limited under section 802.' [Citation.] [¶] [S]ection 802 also permits the trial court to find the expert is precluded 'by law' from using the reasons or matter as a basis for the opinion. '" Law" includes constitutional, statutory, and decisional law.' [Citation.] Thus, 'construed in the context of section 160, section 802 authorizes a court to promulgate case law restrictions on an expert's "reasons" . . . .' [Citation.] This means that a court may inquire into, not only the type of material on which an expert relies, but also whether that material actually supports the expert's reasoning. 'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.' [Citations.]

"Thus, under . . . sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. Other provisions of law, including decisional law, may also provide reasons for excluding expert opinion testimony." (*Sargon, supra,* 55 Cal.4th at pp. 769-772, fn. omitted.)

At his section 402 hearing, Chiu testified that he tested Bokkes in March 2013. Bokkes tested positive for allergies to certain molds; to tree, grass, and weed

12

pollens; to dust mites; to cats; and to dogs. Bokkes had strongly positive allergic reactions to penicillium, stachybotrys, cladosporium, alternaria, and aspergillus molds.

Chiu tested Adeline in May 2013. As to molds, he tested her for alternaria, aspergillus, cladosporium, penicillium, and stachybotrys. She tested strongly positive to all of them.

Chiu tested for certain species of each mold, the species provided by companies that supplied allergens for testing. The mold report, however, identified each mold by its genus.[11] Chiu did not have information that would have allowed him to state that a *species* of mold to which Bokkes and Adeline had reacted was present at the business site. To bridge this gap, Chiu resorted to a theory of "cross-reactivity." This theory posits that species within a genus are similar, so that an allergy to one species will carry over into the others within the genus. So, for example, an allergy to one aspergillus mold species (of which there are somewhere between 50 and 200) would cause an allergic reaction to other species of the same mold. Chiu testified that cross-reactivity also applies across genera, so that, for example, an allergy to some species of the aspergillus genus of mold would also provoke an allergic reaction to some species of the penicillium mold. The percentages of cross-reactions between species of two genera were, however, quite low.[12] After having heard further section 402 testimony on this issue, the court determined the cross-reactivity theory was not sufficiently established in the scientific literature to permit it to go to the jury.

Chiu opined that Bokkes' and Adeline's mold allergies developed as a result of their exposure at the business location.[13] In forming this opinion, he relied partly

---

[11] Defendants' expert testified that there were between 50 and 200 species of two genera of mold identified in the report and probably more than six species of another genus. He further testified that, with one exception, the *species* of mold present could not be determined from the report.

[12] The highest instance of cross-reaction cited in the article on which Chiu relied was 19.6 percent to 21 percent.

[13] He also attributed their symptoms to house dust mites. No testing for dust mites was performed at the business property.

13

on a history of exposure and reports of improvement in the allergic symptoms once they left the premises and partly on the mold report. He testified that he would have arrived at the same conclusion without the report, because of the usual consequences of water intrusion.

The trial court, however, perceived a gap in the causation analysis: without the mold report, Chiu had no reliable way of knowing whether the species of mold allergens that elicited a positive response at his office were the same ones found in the business premises. He could testify from his own experience as a medical practitioner that certain genera of molds to which the plaintiffs had positive allergic reactions usually followed on water intrusion, but the trial court concluded that this was too tenuous a link for causation, particularly because the mold report itself had been excluded. Without the report, to find for the plaintiffs on causation the jury would have had to assume – in the absence of any hard evidence whatsoever – that these mold genera were actually found at the business premises and that the particular species of each genus to which plaintiffs had reacted positively was also present. As *Sargon* held, "'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.' [Citations.]" (*Sargon, supra,* 55 Cal.4th at p. 771.)

Unfortunately, the discussions of the mold report, Chiu's testimony, and causation became considerably muddled by the introduction of references to the *Kelly* test. Under this three-step test for the admission of evidence generated by a new scientific technique, "(1) the reliability of the technique must be sufficiently established to have gained general acceptance in the relevant scientific community; (2) the witness providing the evidence must be properly qualified as an expert; and (3) the evidence must establish that, in the particular case, the correct and accepted scientific technique was actually followed." (*People v. Brown* (2001) 91 Cal.App.4th 623, 626.) In general, the *Kelly* test does not apply to medical evidence. (*People v. McDonald* (1984) 37 Cal.3d 351, 373, overruled on other grounds *People v. Mendoza* (2000) 23 Cal.4th 896.)

14

Furthermore, the test applies to *techniques*, for example, DNA analysis. (See *People v. Jones* (2013) 57 Cal.4th 899, 937; see also *People v. Shirley* (1982) 31 Cal.3d 18, 51-52, superseded by statute on other grounds.)

The only technique about which Chiu testified was the tests he performed on Bokkes and Adeline to determine what they were allergic to. This testing technique was evidently a standard one, and no one appeared to regard it as either new or unreliable. The other technique playing a part in the case was the air sampling process, which has apparently been used in other mold cases without any indication that it was a new scientific technique. (See *Dee v. PCS Property Management, Inc.* (2009) 174 Cal.App.4th 390, 392-393, 398; *Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1303.) Unfortunately, the cross-reactivity theory Chiu advanced to bolster causation was also discussed in terms of *Kelly*, and this theory was not a technique at all.

This was incorrect, but we review the trial court's results, not its reasoning. (*HPT IHG-2 Properties Trust v. City of Anaheim* (2015) 243 Cal.App.4th 188, 203.) An examination of the record shows the trial court was using *Kelly* as a shorthand for what was really bothering it – the lack of foundation for Chiu's opinion that mold at the business premises caused Bokkes' and Adeline's symptoms. This uneasiness, in turn, originated from Chiu's heavy reliance on a mold report that lacked expert verification.[14] As the court made clear, the *Kelly* discussion was intimately bound up with the trustworthiness aspect of the business records exception for the mold report. But the mold report was not trustworthy in the absence of expert testimony, and therefore Chiu could not rely on it to support his assumption that the kinds of molds to which the plaintiffs were allergic existed at the business premises. The other aspect of Chiu's

---

[14] It should also be noted that counsel entered wholeheartedly into the *Kelly* discussions in this spirit; no one ever suggested to the court that *Kelly* did not apply. For example, "The Court: . . . The second area of inquiry with respect to Dr. Chiu is whether or not what he testified to already is sufficient to get the court to conclude that the *Kelly-Frye* procedure – a *Kelly-Frye* type procedure was properly implemented. [¶] Would that be a fair expression? [¶] [Plaintiffs' counsel]: I think that's a fair expression."

15

causation opinion – based on the cross-reactivity theory – was dispatched as lacking an adequate scientific foundation in peer-reviewed journals.[15] This theory was Chiu's bridge between the allergens he used in his office tests and the allergens purportedly present at the site. With that bridge down, the only causation evidence remaining was Chiu's testimony that he had seen and read about many patients with mold allergies, and he knew that certain kinds of mold grew in wet conditions. The court articulated the basis of this opinion regarding causation – "just the fact of water intrusion" – and decided it was too slender a reed on which to hang an opinion about causation that would be presented to the jury as a studied scientific conclusion. The mold report made it clear the issue was potentially far more complicated than just wet conditions.

Regardless of *Kelly*, Chiu as a medical doctor would speak to the jury with an aura of scientific sanctity about him. It was the court's job to make sure that the aura had a sound scientific basis before it cast its spell. (See *People v. Venegas* (1998) 18 Cal.4th 47, 80 [necessary to forestall jury's uncritical acceptance of scientific evidence].) The court concluded it did not. We cannot say the court's determination exceeded the bounds of reason. (*See Poniktera v. Seiler* (2010) 181 Cal.App.4th 121, 142; *Caloroso v. Hathaway* (2004) 122 Cal.App.4th 922, 928.)

**III.**       **Exclusion of Plotkin's Deposition Statement**

Plaintiffs sought to introduce deposition testimony from Plotkin that he (Plotkin) was responsible for maintaining the outside of the property while Bokkes was responsible for the inside. At his deposition, Plotkin was asked, "If [the shut-off valve for the pipe] was located on the outside, is it safe to say that would have been your responsibility?" To which Plotkin replied, "Correct." After taking the defendants'

---

[15]       Appellants identified the exclusion of the cross-reactivity evidence as another instance of the misapplication of the *Kelly* test and prejudicial error. Again, it is clear that the court was performing its gatekeeper function by excluding evidence without an adequate scientific foundation. In their reply brief, appellants asserted that cross-reactivity between mold genera is irrelevant to the case.

motion in limine under submission, the trial court excluded this evidence as cumulative, because the lease already established the landlord's duty to maintain the structure.

Appellants now argue that this evidence was relevant to the causes of action against Plotkin for negligence, fraud, and intentional infliction of emotional distress. It could also have been used for impeachment, as evidence of Plotkin's state of mind and malice and of his motive for repairing the pipe once before in 2003, his course of dealing with Bokkes, his understanding of the lease, and his consciousness of guilt.

Although this list of possible uses for this evidence is impressive in length, it is somewhat lacking in detail. Intentional infliction of emotional distress was not one of the causes of action sent to the jury, so the exclusion of evidence relevant to this cause of action could not have been erroneous. Appellants do not explain how this evidence would have been relevant to their fraud claim, since that claim was based on false representations that repairs would be made, not on a repudiation of responsibility to repair. Likewise, appellants do not explain how the statement is evidence of malice or consciousness of guilt or how Bokkes' and Plotkin's course of dealing was relevant to any cause of action.[16]

The trial court acknowledged that this evidence was relevant to the negligence claim, but excluded it as cumulative. We need not determine whether the trial court ruled correctly on this aspect of the motion, because even if the evidence was erroneously excluded, there was no prejudice. Even without this evidence, the jury found that Plotkin had created a nuisance and that he had been negligent. Even without hearing this statement, the jury found Plotkin was responsible for the flood.

Negligence and nuisance can sound in contract or in tort. (See *Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 919 [nuisance]; *Perry v. Robertson* (1988) 201

---

[16] The exclusion of evidence as a result of a motion in limine does not, of course, preclude its use for impeachment. If Plotkin had denied at trial that he had ever said he was responsible for maintaining the shut-off valve, Bokkes could have used this deposition testimony to impeach him. (See *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 945-946.)

17

Cal.App.3d 333, 340 [negligence].)  Part of the required showing for a tort is a causal connection between the wrongful conduct and the plaintiff's injury.  (*Vanderpol v. Starr* (2011) 194 Cal.App.4th 385, 395-396 [nuisance]; *Dixon v. City of Livermore* (2005) 127 Cal.App.4th 32, 43 [negligence].)  A plaintiff alleging breach of contract must also prove a causal connection between the breach and the injury.  (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102-1103.)

The jury found, in essence, that Plotkin acted negligently, but that his actions did not cause harm to Bokkes individually.  Appellants have not explained how the admission of Plotkin's statement about his responsibility for the outside of the building would have changed that finding.

## IV.        Exclusion of Real Estate Broker's License Evidence

Business and Professions Code section 10131, subdivision (b), defines "real estate broker" as, among other things, one who, for "another or others" and "for a compensation," "collects rents from real property, or improvements thereon, or from business opportunities."  Business and Professions Code section 10130 provides in pertinent part, "It is unlawful for any person to engage in the business of, act in the capacity of, advertise as, or assume to act as a real estate broker . . . within this state without first obtaining a real estate license from the department . . . . [¶]  The commissioner may prefer a complaint for violation of this section before any court of competent jurisdiction, and the commissioner and his or her counsel, deputies, or assistants may assist in presenting the law or facts at the trial. [¶]  It is the duty of the district attorney of each county in this state to prosecute all violations of this section in their respective counties in which the violations occur."  Business and Professions Code section 10157 provides, "No real estate license gives authority to do any act specified in this chapter to any person, other than the person to whom the license is issued."[17]

---

[17]     We do not here deal with the question of whether these Business and Professions Code statutes create a private cause of action.  (See *Johnson v. Honeywell Internat. Inc.* (2009) 179 Cal.App.4th 549, 555-556.)

18

Defendants moved in limine to exclude evidence that Plotkin, Khokher, and Pablo all lacked real estate broker's licenses. The trial court granted the motion under section 352.

Plaintiffs/appellants argue that the exclusion of this evidence was error as to Khokher and Pablo because of a previous ruling on a demurrer filed by Khokher. An examination of this ruling reveals that the trial court (different judge) appeared to be summarizing plaintiffs' arguments regarding the code section rather than adopting them. In fact, the court sustained without leave to amend Khokher's demurrer to their attempt to state a cause of action based on his lack of a real estate broker's license.[18]

Presumably, Bokkes wished to introduce this evidence to establish negligence per se with respect to the negligence and nuisance causes of action. "[N]egligence is presumed if the plaintiff establishes four elements: (1) the defendant violated a statute or regulation; (2) the violation caused the plaintiff's injury; (3) the injury resulted from the kind of occurrence the statute or regulation was designed to prevent; and (4) the plaintiff was one of the class of persons the statute or regulation was intended to protect." (*Daum v. Spinecare Medical Group* (1997) 52 Cal.App.4th 1285, 1306.) The trial court determines the last two elements, as they are matters of statutory interpretation. (*Capolungo v. Bondi* (1986) 179 Cal.App.3d 346, 350.)

Plotkin was the owner and lessor of the Lake Forest property; he was not acting "for another or others." (Bus. & Prof. Code, § 10131; see *Horning v. Shilberg* (2005) 130 Cal.App.4th 197, 203-204.) He did not need a broker's license to act on his

---

[18] Appellants further argue that the trial court erroneously excluded an exhibit indicating that Pablo and Plotkin were operating as a joint venture. Their brief does not give sufficient information to review this argument. The only citation is to the exhibit itself, a fictitious business statement filed on April 25, 2014, long after the events recounted in the complaint. We are not directed to the portion of the reporter's transcript where the court excluded this exhibit, if it did. In the absence of a proper record, we disregard the purported facts and assume the court ruled correctly. (*Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 175, fn. 3; *Vo v. Las Virgenes Municipal Water Dist.* (2000) 79 Cal.App.4th 440, 447.)

19

own behalf. Bokkes also offered no evidence that Plotkin collected rents "for a compensation."

The gravamen of appellants' complaint against Khokher and Pablo was that they ignored Bokkes' requests to repair the leaking pipe before the flood, kept telling him the flood damage was going to be repaired when there was never any intention of doing so, or that they were supposed to get the damage repaired, but did not. The allegations of fault against Pablo and Khokher thus had nothing to do with collecting rents. Property managers are not required to obtain a license to perform activities, such as repairs, that are not listed in the statute as requiring a license. (*MKB Management, Inc. v. Melikian* (2010) 184 Cal.App.4th 796, 802.)

Moreover, as with the exclusion of Plotkin's statement, appellants fail to address the prejudice element of excluding evidence. Once again, we point out that the jury found both Khokher and Pablo had created a nuisance and breached their duty of care. Other evidence accomplished everything that the admission of this evidence could have done for Bokkes. The problem was causation. "Under the doctrine of negligence per se, the plaintiff 'borrows' statutes to prove duty of care and standard of care. [Citation.] The plaintiff still has the burden of proving causation." (*Johnson v. Honeywell, supra,* 179 Cal.App.4th at p. 558.) Appellants have once again failed to explain how evidence that Pablo and Khokher lacked real estate broker's licenses would have solved the causation problem. Likewise, appellants have not explained how admission of this evidence would have changed the jury's fraud verdict.

V.        **Denial of Motion to Amend Complaint**[19]

The trial was winding down when Bokkes moved to amend the sixth amended complaint to add his corporation as a plaintiff.[20] As he belatedly realized, none

---

[19] Appellants also assert that the trial court abused its discretion by denying a motion to reopen evidence. The record does not contain any such motion with respect to introducing the corporation as a plaintiff. The record citation given in the opening brief is to an opposition to a defense nonsuit on the fraud claim.

of the property allegedly injured during the flood and afterwards belonged to him; it had all been transferred to the corporation well before the flood. Likewise, the expenses incurred to move the business to another location were corporate expenses. The court denied the motion without stating its reasons.

We review the trial court's decision to grant or deny a motion to amend for abuse of discretion. (*City of Stanton v. Cox* (1989) 207 Cal.App.3d 1557, 1563.) We cannot say that the trial court abused its discretion here. The complaint had already been amended six times; the corporation's existence was certainly not something that came up unexpectedly at trial. Bokkes testified about the damaged property on the first day of testimony, October 1, yet he waited more than two weeks to move to amend, when the trial was over except for closing arguments. The defense made a detailed argument regarding the prejudice a last-minute amendment would entail, and we must assume the trial court found this argument compelling. Nothing before us suggests an abuse of discretion here.

## DISPOSITION

The judgment is affirmed. Respondents are to recover their costs on appeal.

BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.

---

[20] The actual motion to amend was made orally and was not reported. We can divine the basis for the motion only from a supplemental opposing brief. From this document is it clear that the purpose of the amendment was to add the corporation as a plaintiff. This is the only party document referring to the motion to amend in the record.

21